# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CIELITO VALENCIA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08-cv-533 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This action arises out of the horrific June 25, 1996 bombing of Khobar Towers, a housing complex for United States Air Force personnel in Dhahran, Saudi Arabia.  The explosion sheared off the side of Building 131 of the complex and reduced the rest of the structure to rubble, killing nineteen United States servicemen while injuring hundreds of others—including Airmen Cielito Valencia, Steven Wolfe, and Sonya Turner Broadway.  In early 2008, these three airmen, along with Airman Valencia's mother, Luz Southard, brought suit pursuant to the Foreign Sovereign Immunities Act ("FSIA") against defendants Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Iranian Revolutionary Guard Corps ("IRGC").  Plaintiffs alleged that these defendants provided material support and assistance to Saudi Hezbollah, the terrorist organization responsible for the attack on Khobar Towers, and thus are subject to suit under the FSIA's "state-sponsored terrorism" exception, codified at 28 U.S.C. § 1605A.  This Court subsequently assigned the matter to a special master for the collection and review of evidence concerning plaintiff's standing and the extent of their injuries.  Now that this

process is complete, the Court turns to the merits of plaintiffs' suit and, for the reasons set forth below, finds that plaintiffs have established by sufficient evidence that defendants are responsible for the Khobar Towers bombing and awards damages to plaintiffs as appropriate.

## II.     BACKGROUND

### A.     Prior Khobar Towers Litigation

The history of litigation arising from the attack on Khobar Towers is substantial, and derives primary from two cases: *Blais v. Islamic Republic of Iran*, in which an Air Force search and rescue coordinator, along with his mother and step-father, sought to recover damages for their injuries, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006); and *Heiser v. Islamic Republic of Iran*, in which representatives for 17 of the 19 persons killed in the explosion brought suit. 466 F. Supp. 2d 229, 248 (D.D.C. 2006) ("*Heiser I*"). In these two cases plaintiffs submitted significant evidence concerning the event itself, as well as the perpetrators of the attack. In *Blais*, the plaintiffs presented the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time, and under his direction the FBI "conducted a massive and thorough investigation of the attack." *Blais*, 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI and after the attack became Section Chief for all international terrorism at the Bureau—a position in which he was responsible "for day to day oversight of the FBI investigation." *Id*. In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and an expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id*. at 48–49. In *Heiser*, even more extensive evidence was presented to a magistrate judge over the course of more than two weeks. *Heiser I*, 466 F. Supp. 2d at 250. Though relying on much of the same evidence as the plaintiffs in *Blais*, the *Heiser* plaintiffs were also able to

present live testimony from Mr. Freeh, as well as additional statements from Mr. Watson and Dr. Tefft. *Id*. at 253–54. In addition, the *Heiser* plaintiffs presented Dr. Patrick Clawson, a participant in a Commission investigating the Khobar Towers attack and who studies Iranian support for terrorism. *Id*. at 253. The Court qualified Dr. Clawson as an expert, and received his testimony concerning "(1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy." *Id*. Based on this evidence, this Court determined in each case that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah[1] to execute the plan, and the MOIS participated in the planning and funding of the attack." *Id*. at 265; *see also Blais*, 459 F. Supp. 2d at 48 (finding that defendants "were responsible for planning and supporting the attack on Khobar Towers").

## B. This Case

Plaintiffs commenced this action in early 2008 alleging that Saudi Hezbollah "act[ed] as an agent of the Islamic Republic of Iran [and] performed acts within the scope of its agency, within the meaning of 28 U.S.C. §§ 1605A and 1605 note, caused that injuries to the Plaintiffs." Complaint ¶ 14, Mar. 28, 2008 [1]. In support of this central claim, plaintiffs allege facts consistent with those found by this Court in *Blais*, *Heiser*, and other actions arising out of the Khobar Towers bombing. Specifically, plaintiffs allege that (1) Iran used MOIS and the IRGC as agents to develop a program of planned acts of terrorism throughout the Middle East, *id*. at ¶ 16, (2) defendants—working in concert—established, funded and supported Hezbollah, *id*. at ¶ 17, and (3) defendants provided Hezbollah with the funds, materials and tools necessary to plan and carry out the attack on Khobar Towers. *Id*. at ¶¶ 18–20. Based on these allegations, the

---

[1] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007), *rev'd on other grounds*, 573 F.3d 835.

Complaint sets forth claims for personal injury, assault and battery under state law, economic damages, intentional infliction of emotional distress, solatium, and punitive damages.

Plaintiffs first attempted to serve the relevant papers and necessary translations on the defendants by certified mail, Certificate of Clerk, June 26, 2008 [4], as required by statute. *See* 28 U.S.C. § 1608(a) (setting forth preferred methods of service in FSIA actions). After the mailings were returned, Summons Returned Unexecuted, Sep. 12, 2008 [5], plaintiffs attempted service by diplomatic channels. Request, Sep. 25, 2008 [6]. According to the diplomatic note returned to the Court, service through diplomatic means was effected on December 9, 2008, Return of Service/Affidavit, Mar. 6, 2009 [11], which obligated defendants to appear and answer or otherwise move to dismiss by February 2, 2009. *See* 28 U.S.C. § 1608(d) ("[A] foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section."). Almost six months after defendants' responses were due and pursuant to plaintiffs' request, the Clerk entered default on behalf of all defendants, Clerk's Entry of Default, Jan. 25, 2010 [16], and the Court subsequently granted plaintiffs' motion for entry of default judgment. Order Granting Motion for Default Judgment, July 2, 2010 [22]. Following entry of default, plaintiffs requested the assignment of a special master to this action for the collection of evidence concerning damages. Affidavit Concerning Appointment of Special Master, July 13, 2010 [23]. The Court subsequently appointed a special master and directed plaintiffs to promptly submit all necessary evidence to his office. Order Appointing Special Master, July 23, 2010 [24]. Several months later the special master filed his reports concerning the scope of each plaintiff's injuries. Having now received all evidence necessary to render final judgment, the Court makes the subsequent findings of fact and reaches the following conclusions of law.

## III.    FINDINGS OF FACT

Under the FSIA, a court cannot simply enter default judgment against a foreign state, but must, out of respect for the principle of sovereign immunity, ensure that plaintiffs "establish [their] claim or right to relief by evidence that is satisfactory to the court."  28 U.S.C. 1608(e). This statutory requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default.  *Rimkus v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 1615, 2010 U.S. Dist. LEXIS 120991, at *13–14 (D.D.C. Nov. 16, 2010) (internal quotations omitted) ("*Rimkus II*").  To satisfy this burden, plaintiffs here presented substantial testimonial and documentary evidence concerning their backgrounds and injuries suffered, and also requested that the Court take judicial notice of prior findings of fact and evidence related to the Khobar Towers bombing and defendants' involvement in the attack.  Prior judicial findings of fact "represent merely a court's probabilistic determination as to what happened," and thus constitute hearsay and are inadmissible.  *Anderson v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 535, 2010 U.S. Dist. LEXIS 126457, at *10–11 (D.D.C. Dec. 1, 2010). However, this Court has previously observed that "the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack."  *Rimkus II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *18 (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). Thus, the appropriate approach when considering related proceedings in FSIA cases "permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced."  *Id*. (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010)).  Bearing these parameters of

judicial notice in mind, and armed with the special master's summary of the evidence, the Court renders the following findings of fact:

*Cielito Valencia*

Documentary evidence establishes that Airman Cielito Valencia was born in the United States and has remained a citizen his entire life. Report of Special Master Concerning Counts I-III (Cielito Valencia) 5, Mar. 23, 2011 [28] ("Valencia Rpt."). Airman Valencia enlisted in the Air Force in 1994, and began training in San Antonio, Texas as a supply management specialist. *Id*. at 6. He was subsequently transferred to Elgin Air Force Base until April, 1996, at which time he was deployed to Saudi Arabia as part of the 58th Fighter Squadron. *Id*. at 6–7.

*Steven Wolfe*

Documentary evidence shows that Airman Steven Wolfe was born in LaGrande, Oregon, and has been a United States citizen his entire life. Report of Special Master Concerning Counts I-III (Steven Wolfe) 5, Mar. 24, 2011 [29] ("Wolfe Rpt."). Airman Wolfe enlisted in the Air Force in 1993 at age 18, having wanted to work on aircraft his entire life. *Id*. at 6. He completed basic training at Lackland Air Force Base in San Antonio, Texas and then went through additional technical and munitions training at Lowery Air Force Base near Denver, Colorado. *Id*. In 1994 he was transferred to Elgin Air Force Base and subsequently deployed to Saudi Arabia as a specialist attached to the 58th Fight Squadron, where his work involved loading and arming, and then unloading and disarming, weapons systems on the aircraft. *Id*. at 6–7.

*Sonya Turner Broadway*

Documentary evidence demonstrates that Airman Sonya Turner Broadway was born in Cumberland, Maryland, and has been a United States citizen her entire life. Report of Special Master Concerning Counts I-III (Sonya Turner Broadway) 5, Mar. 22, 2011 [27] ("Broadway

Rpt."). Airman Broadway enlisted in the Air Force in 1994. *Id.* at 6. At the time, she wanted to work as a police officer, so she joined the military to gain experience working as a security specialist. *Id.* Airman Broadway received basic training at Lackland Air Force Base, and subsequently spent two months at the police academy at Lackland before training for two additional months at the academy at Fort Dix, New Jersey. *Id.* at 6–7. Airman Broadway then worked in the Security Police forces at F.E. Warren Air Force Base in Cheyenne, Wyoming, before volunteering for temporary deployment in 1996. *Id.* at 7. Airman Broadway was deployed to Saudi Arabia and billeted to work security for Building 131 of the Khobar Towers complex, where she was assigned a number of duties, including patrolling the perimeter of the complex, working the flight lines and manning the entry gates into the area. *Id.*

*Defendants*

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism . . . since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (internal quotations omitted). Defendant MOIS is the secret police and intelligence organization of Iran, and has been previously characterized by the Court as both a "division of the state of Iran," *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010), and a "conduit for [Iran]'s provision of funds to Hezbollah." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010). Defendant IRGC has been described by expert testimony as "a non-traditional instrumentality of Iran" that acts as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." *Blais*, 459 F. Supp. 2d at 47.

*The Khobar Towers Bombing*

Testimony was received by this Court in both *Blais* and *Heiser* from multiples witnesses of the bombing as well as several experts who studied the history of the event and the parties

behind the attack. This testimony included that of Mr. Freeh—the FBI director at the time of the attack—and Mr. Watson—a chief in the counterterrorism division of the FBI who oversaw the day-to-day investigation of the bombing. *Id*. at 48. A review of all of the evidence establishes the following record of the attack on Khobar Towers:

In the late evening on June 25, 1996, a large gasoline tanker pulled up to the perimeter wall of the complex. After the vehicle came to a stop, the driver of the tanker leapt out of the truck and into a waiting car, which sped from the scene. *Id*. at 47. Though the truck did not go unnoticed by guards atop Building 131—the building nearest the parked tanker—less than 20 minutes after being parked the truck exploded with a force equivalent of 20,000 pounds of TNT. At the time, this was the largest non-nuclear explosion to have ever occurred. *Id*. at 47–48. Rocked by the explosion, the face of Building 131 closest to the blast was sheared away from the foundation, while the remaining structure was largely reduced to rubble. Nineteen United States Air Force personnel were killed and hundreds of people were wounded in the attack. *Id*. at 48.

The explosion at Khobar Towers caused each of Airmen Valencia, Wolfe and Broadway to suffer various injuries. Airman Valencia was in Building 131 at the time of the explosion, and suffered severe wounds after being pummeled by pieces of glass during the collapse of the building. Valencia Rpt. at 7–8. In total, he was hit with between 50 and 75 separate pieces of glass, and has had to endure over 25 surgeries since the attack to remove glass shards and repair the damage to his legs and abdomen. *Id*. at 9–10. Airman Wolfe was not in the complex at the time of the explosion, but was exposed to death all around him after arriving on the scene and being forced to dig through the rubble and collect people and—often—body parts. Wolfe Rpt. at 7–8. Though he was lucky to escape physical injury, the trauma of his experiences after the explosion eventually manifested as post-traumatic stress disorder ("PTSD"), which continues to

plague Airman Wolfe.  *Id*. at 8–12.  Airman Broadway was in her room when the bombing occurred, and was immediately thrown from her feet and pummeled with glass.  Broadway Rpt. at 8.  Following the attack, Ms. Broadway suffered a continuing pain in her foot, and eventually learned that it had been broken in the bombing.  *Id*. at 9–11.  Finally, though not in Saudi Arabia at the time, Airman Valencia's mother, Luz Southard, also suffered through a terrifying period of despair following the attack, as she was unable to learn of her son's condition for several hours, and was unable to see him for several days after the event.  Valencia Rpt. at 12–13.

*Iranian Involvement in the Attack*

The *Blais* Court received testimony from Messrs. Freeh and Watson concerning the subsequent investigations into the causes of, and parties behind, the bombing of Khobar Towers. The FBI investigation in which these witnesses were involved was conducted by over 250 agents from the Bureau, lasted more than five years, and led to several indictments.  The testimony in *Blais* establishes the following findings:

The individuals involved in the attack were part of "Saudi Hezbollah" and were recruited by a Brigadier General in the IRGC.  *Blais*, 459 F. Supp. 2d at 48.  The group operated out a base maintained by Iran in the Bekaa Valley, worked in conjunction with the IRGC to develop the materials used in the bombing, and were funded by MOIS and the IRGC.  *Id*.  Before the bombing, leaders of Saudi Hezbollah and the IRGC General supporting them met with Ayatollah Khameini, the supreme leader of Iran at the time, and received approval for the attack.  *Id*.  The attackers then coordinated with high-ranking officers in MOIS, who provided the intelligence necessary to plan and undertake the operation.  *Id*.  Based on these conclusions, both Messrs. Freeh and Watson testified in *Blais* that they believed that defendants were responsible for the bombing of Khobar Towers.  *See id*. (recounting Mr. Freeh's testimony that he has, on numerous

occasions, "publicly and unequivocally stated his firm conclusion . . . that Iran was responsible for planning and supporting" Khobar Towers bombers); *id*. (setting forth Mr. Watson's sworn testimony that "information uncovered in the investigation clearly pointed to the fact that there was Iran, MOIS and IRGC involvement in the bombing") (internal quotations omitted).

In addition to the FBI investigators, this Court has also previously received testimony from several experts on the Khobar Towers bombing and Iran more generally. In *Blais*, for example, the Court received the testimony Dr. Bruce Tefft, a founding member of the CIA's counterterrorism bureau and consultant on terrorism issues. *Id*. at 48–49. Dr. Tefft explained that, in his opinion, "defendants the Islamic Republic of Iran and the [IRGC] were responsible for planning and supporting the attack on the Khobar Towers." *Id*. Similarly, the *Heiser* Court heard from Dr. Patrick Clawson, a member of the Commission that investigated the attack who has spent his life studying Iran. *Heiser I*, 466 F. Supp. 2d at 253. Dr. Clawson testified that "the government of Iran formed the Saudi Hezbollah organization" and that "the IRGC was responsible for providing military training to Hezbollah terrorists as to how to carry out a terrorist attack." *Id*. He concluded his testimony by explaining that, in his opinion, "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id*.

## IV.    CONCLUSIONS OF LAW

Based on the above findings of fact, the Court reaches the following conclusions of law:

### A.    Jurisdiction

"[F]oreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003). This immunity is provided by the FSIA, which both withdraws original jurisdiction over suits against foreign states from all state and

federal courts, and limits the circumstances in which a foreign state's sovereign immunity is waived so that a court may hear a claim against it. 28 U.S.C. §§ 1604 & 1605A(a)(2). These protections are not absolute, but are subject to certain enumerated exceptions—including the state-sponsored terrorism exception. *Id.* at § 1605A(a)(1)–(2). Here, the evidence is sufficient to warrant a finding that jurisdiction exists and that defendants' immunity has been waived.

### 1. Original Jurisdiction

One of the exemptions from the broad withdrawal of courts' jurisdiction is found in the state-sponsored terrorism exception, which provides that courts have jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id.* at § 1605A(a)(1). Each of these requisite conditions has been met here. First, the Complaint seeks only compensatory and punitive damages in relief. Complaint at 14. Second, defendant Iran is unquestionably a foreign state. As to defendants MOIS and the IRGC, the Act provides that—for purposes of liability—a foreign state includes "a political subdivision . . . or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The D.C. Circuit has directed lower courts to inquire as to whether a particular foreign entity "is an integral part of a foreign state's political structure"; if so, it constitutes the foreign state itself for FSIA purposes. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). As set forth above, the Court has determined that MOIS is a division of the state of Iran, while the IRGC is an instrumentality that acts as the military arm of the state. *See supra* Section III. Under these circumstances, both entities constitute a foreign state under *TMR Energy* and § 1603(a). Third, the special master reports establish that each airman at the center

of this case suffered both physical and mental injuries as a result of the attack on Khobar Towers. *See infra* Section IV.C.1. Fourth, the overwhelming evidence and expert testimony summarized above demonstrates that defendants collectively planned the bombing and aided Saudi Hezbollah in the attack. *See supra* Section III. This evidence is sufficient to establish "some reasonable connection between the act . . . and the damages which plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Finally, the investigations into the causes of the Khobar Towers bombing establish that defendants provided material support for an act of extrajudicial killing that was carried out by members of Saudi Hezbollah. Thus, based on the factual findings above, the Court has jurisdiction over this matter.

### 2. Waiver of Sovereign Immunity

Though the Court may exercise jurisdiction over this dispute, it still may not hear a claim against a foreign state unless defendants have been found to have waived sovereign immunity. Waiver of sovereign immunity may be explicit or by operation of statute. Under the FSIA, a foreign defendant's immunity is waived where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section," (2) "the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii). Here, the evidence establishes that Iran was designated a state-sponsor of terrorism by the U.S. Secretary of State well before the bombing of

Khobar Towers, U.S. Dep't of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984, that the victims were all American citizens, *see supra* Section III, and that the attack occurred in Saudi Arabia, and not Iran. *See id.* Under these circumstances, defendants' immunity under the FSIA is waived.

### B.    Liability

The FSIA's state-sponsored terrorism exception permits a plaintiff to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. §§ 1605A(a)(1) & (c). The third and fourth elements in this cause of action—causation and injury—"demand that a plaintiff set forth sufficient facts that not only establish a causation as a factual matter, but that also demonstrate the culpability and liability of the defendant as a matter of law." *Rimkus II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991, at *28. A plaintiff must therefore "'prove a theory of liability' . . . . generally through the lens of civil tort liability." *Id.* (quoting *Valore*, 700 F. Supp. 2d at 73). The Court examines each of these elements in turn.

### 1.    Act

The evidence in this case establishes that defendants were responsible for the bombing of Khobar Towers, an act of brutality responsible for the deaths of 19 Air Force personnel and injuries to hundreds of soldiers and civilians—including Airmen Valencia, Wolfe and Broadway. These actions constitute both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability under § 1605A.

The FSIA defines extrajudicial killing by reference to the Torture Victims Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That act provides that an extrajudicial killing is

> [(1)] a deliberated killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. In this case, the evidence relied upon by the Court in reaching the findings of fact establishes that defendants Iran, MOIS and the IRGC were all involved in the planning and approval of Saudi Hezbollah's bombing of Building 131. *See supra* Section III.B. Nor is there any evidence that these acts were judicially sanctioned by *any* judicial body—much less a court that respects guarantees of life and liberty. Moreover, the evidence demonstrates that Saudi Hezbollah, in attacking the Khobar Towers complex, was acting under the direction, and on behalf, of defendants—and thus was acting as their agent. *See* Restatement (Second) of Agency § 1(1) ("Agency is the fiduciary relationship which results from the manifestations of consent by one person to another that the other shall act on his behalf and subject to his control."). Defendants thus committed an extrajudicial killing under the FSIA through their agent Saudi Hezbollah.

With respect to the provision of material support, the FSIA looks to the definition provided by the U.S. criminal code, 28 U.S.C. § 1605A(h)(3), which states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). As seen above, the evidence relied upon by the Court in reaching its finding of fact establishes, *inter alia*, that defendant IRGC provided materials and shelter for members of Saudi Hezbollah in planning and preparing the attack, that defendant Iran financed

the operation, and that defendant MOIS provided members of Saudi Hezbollah with false documents and expert advice—all for the purpose of executing the bombing. *See supra* Section III.B. These acts undoubtedly constitute the provision of material support or resources.

Moreover, with respect to financial support, this Court has previously determined that "the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning" of the FSIA state-sponsored terrorism exception. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 19 (D.D.C. 1998)). Thus, where a foreign state routinely funnels money to a terrorist organization, "a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises" to satisfy his obligation under the statute. *Id.* (citing *Flatow*, 999 F. Supp. at 19). Here, Dr. Clawson testified in *Heiser* that defendants provide routine financial assistance to Hezbollah. *Heiser I*, 466 F. Supp. 2d at 253. Thus, defendants may also be held liable for financing groups such as Hezbollah under the state-sponsored terrorism exception.

### 2. Actor

The Court has determined that Saudi Hezbollah acted at the behest of defendants Iran, MOIS and the IRGC in bombing Building 131 of the Khobar Towers complex, and also that all defendants here provided financial and material support to Saudi Hezbollah so that the group could execute the attack. *See supra* Section III.

### 3. Theory of Recovery – Causation & Injury

There is but one cause of action under § 1605A; however, as this Court has previously explained, there are many theories of recovery that may satisfy the third and fourth elements of

the federal cause of action in § 1605A, which require a plaintiff to demonstrate causation and injury—two elements that, taken together, necessitate "a theory of liability" under which the facts of the case militate the legal conclusion that the defendant's actions caused the plaintiff's injury. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS at *28 ([P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To define the contours of these theories, FSIA plaintiffs and courts must "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery. *In re Terrorism Litig.*, 659 F. Supp. 2d at 61.

Here, plaintiffs do not, strictly speaking, articulate particular theories of recovery, but rather divide their Counts brought against defendants into types of recovery—personal injury (Count I), assault and battery[2] (Count II), economic damages (Count III), intentional infliction of emotional distress (Count IV), solatium damages (Count V), and punitive damages (Count VI). Complaint at 8–14. Despite the lack of clarity in plaintiffs' pleading, the Court will look beyond the mechanical forms pleaded by plaintiffs to identify theories applicable to this case. *See Rimkus II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *51 ("[T]he Court will not dismiss plaintiff's claims without looking beyond the allegations to the evidence for [an applicable] theory."). Based on the allegations in the Complaint and the evidence set forth

---

[2] In the Complaint, plaintiffs label this claim as one for assault and battery under state law. Complaint at 10. However, § 1605A, unlike its predecessor, does not act as a jurisdictional conduit for the assertion of state law claims against foreign states, but rather provides a federal cause of action to promote uniform disposition of terrorism-related judgments under the FSIA. State law claims may therefore not be brought under this provision, *see Beer v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 1807, 2010 U.S. Dist. LEXIS 129953, at *26–28 (D.D.C. Dec. 9, 2010) ("Permitting FSIA plaintiffs to bring state law causes of action under § 1605A would nullify Congress' expressed purpose and largely undermine the sea-change effected by the enactment of the NDAA"), and thus plaintiffs' claim for assault and battery will instead be treated as a theory of recovery under § 1605A, rather than an independent cause of action.

above, the Court identifies three particular theories of relief which are available to plaintiffs in this case: battery, assault, and intentional infliction of emotional distress. The Court discusses each of the legal theories in turn.

*Battery*

Under general principles of law, recovery for battery may be had where a defendant (1) acted "intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13. A harmful contact is one that results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* at § 15. Here, the evidence plainly establishes that defendants, in providing Saudi Hezbollah with the materials, training, and money necessary to detonate a significant explosion near an Air Force residence, acted with an intent to harm plaintiffs. Indeed, acts of terrorism are—by their very nature—intended to harm and terrify others. *Valore*, 700 F. Supp. 2d at 77. Moreover, as set forth below, Airmen Valencia and Broadway suffered significant physical injuries as a result of the attack on Khobar Towers. *See infra* Section IV.C.1. On the basis of this evidence, defendants are responsible for plaintiffs' injuries under a battery theory.

*Assault*

Another theory of recovery available to plaintiffs is assault. An assault occurs when a defendant (1) acts "intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). The actions of defendants here certainly qualify under this standard. Just as terrorist acts are designed to harm others physically, they are also designed to inflict psychological terror by instilling fear of future harm into the victims.

*Valore*, 700 F. Supp. 2d at 76.  And just as plaintiffs here suffered physical injuries as a result of the attack on Building 131, the evidence set forth in the special master reports indicates that plaintiffs were all also struck with fear following the attack.  *See infra* Section IV.C.1.  Thus, the evidence demonstrates that defendants also committed an assault.

*Intentional Infliction of Emotional Distress*

Finally, plaintiffs may also recover upon a theory of intentional infliction of emotional distress.  In articulating the scope of this theory, courts have set forth the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 206 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)) ("*Heiser II*").  Moreover, where the person injured by the relevant acts of defendants is not the plaintiff, but a third party, the scope of this provision is limited by two caveats: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time."  Restatement (Second) of Torts § 46(2)(a)-(b).  With respect to the presence requirement, however, FSIA courts have generally found that because "[t]errorism [is] unique among the types of tortious activities in both its extreme methods and aims [and thus a]ll acts of terrorism are by their very definition extreme and outrageous," *Heiser II*, 659 F. Supp. 2d at 27 (quotations omitted), courts need not strictly enforce the presence requirement.  This is because the function of the presence requirement—to ensure that a plaintiff actually suffered a high degree of emotional distress—is, in state-sponsored terrorism cases, fulfilled by the horrific and terrifying nature of terrorism itself, and thus courts need not strictly enforce the presence requirement.  *Anderson*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 126457 at *45–46.

Here, all four plaintiffs may rely upon theories of intentional infliction of emotional distress to recover under § 1605A. There can be no dispute that defendants, in working with Saudi Hezbollah to plan and execute the attack, sought to cause severe emotional distress to Air Force personnel living in Building 131 and the surrounding area, and thus, consistent with the special master's findings, *see infra* at Section IV.C.1, the three plaintiffs who were stationed at Khobar Towers at the time of the explosion certainly were afflicted with emotional distress. As for the fourth plaintiff—Luz Southard—the evidence demonstrates that she is Airman Valencia's mother, Valencia Rpt. at 11, that she was distraught and inconsolable as she waited anxiously for news of her son's condition following the attack. *Id*. at 12–13. Based on this evidence, plaintiffs have set forth valid claims based on a theory of intentional infliction of emotional distress.

### 4. Jurisdiction

The Court has determined both that it may exercise jurisdiction over defendants in this action, and that plaintiffs are only seeking monetary compensation. *See supra* Section IV.A. This element is thus satisfied, and defendants may be held liable under the federal cause of action provided by § 1605A for the malicious attack on Khobar Towers that injured plaintiffs.

## C. Damages

### 1. Compensatory Damages

There is no systematic method for assigning a value to the amount of "harm" suffered by a victim of state-sponsored terrorism. As one court in this district has previously observed, "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009) (quoting *Blais*, 459 F. Supp. 2d at 59). However, due to the significant—and unfortunate—number of suits brought

pursuant to the state-sponsored terrorism exception of the FSIA, courts have, over time, developed general frameworks that can provide the starting point for the court's calculation of damages. Two such frameworks are applicable here.

Assessing appropriate damages for physical injury or mental disability can depend upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, n.26 (D.D.C. 2007) (citing *Blais*, 459 F. Supp. 2d at 59). In *Peterson*, however, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id*. at 54. In applying this general approach, this Court has explained that it will "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadripeligic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F. Supp. 2d at 84, and will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Id*.

A second basic framework is used by FSIA courts in assessing damages for claims of intentional infliction of emotional distress brought by family members of victims of terrorist attacks. A standardized approach for these cases was developed by this Court in *Heiser*, where it surveyed past awards in the context of deceased victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." 466 F. Supp. 2d at 269. Relying upon the average awards, the *Heiser* Court articulated a framework in which spouses of deceased victims

were awarded approximately $8 million, while parents and children received $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that courts have "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'") (quoting *Peterson*, 515 F. Supp. 2d at 51). As this Court recently explained, in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where "awards are 'valued at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents/children, and siblings, respectively." *Oveissi v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 03 Civ. 1197, 2011 U.S. Dist. LEXIS 23040, at *28–29 n.10 (D.D.C. Mar. 8, 2011) (quoting *Valore*, 700 F. Supp. 2d at 85). In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 74, and that deviations may be warranted when, *inter alia*, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, ___ F. Supp. 2d at __, 2011 U.S. Dist. LEXIS at *30. With these procedures in mind, the Court turns to the calculation of plaintiffs' damages.

### a. Cielito Valencia

Cielito Valencia was inside Building 131 taking a nap before the start of his shift at the time of the explosion that rocked Khobar Towers. Valencia Rpt. at 7. He does not remember the explosion, and can only recall waking up on top of a "big concrete slab" surrounded by rubble. *Id.* When he tried to move, he felt severe pain, and was forced to lay in place until another

airmen threw Airman Valencia over his shoulder and took him to the clinic. *Id*. at 7–8. When he finally gained consciousness for a sufficient time to examine himself, Airman Valencia saw that his lower abdomen and legs had been pummeled by pieces of glass, dozens of which remained protruding from his body. *Id*. at 8. Over the next month, he underwent over ten surgeries to remove pieces of glass and repair a major vein in his foot that had been severed in the bombing. *Id*. at 8–9. The effects of these injuries are still evident today, as Airman Valencia limps when he walks and must take numerous painkillers to get through the day. *Id*. at 9. In addition to his physical injuries, Airman Valencia also began suffering horrific nightmares and abusing alcohol following the attack, and was later diagnosed with PTSD. *Id*. at 9–10. His injuries affect his relationships today, as he is unable to play sports with his son. *Id*. at 10.

Based on the above facts, the special master recommends that Airman Valencia be awarded the standard amount of $5 million in compensatory damages. The Court agrees. Airman Valencia's physical injuries and the lingering psychological effects are severe, but so are those of many victims of state-sponsored terrorism. For example, in *Peterson* this Court awarded the standard damages to a serviceman that suffered a compound fracture in his leg, injuries to his foot, several wounds from shrapnel and severe psychological harm. 515 F. Supp. 2d at 54. Based on past evaluations, the Court finds that the harm suffered by Airman Valencia is consistent with that suffered by many victims of terrorism, and thus does not warrant any deviation from the baseline compensation amount of $5 million.

### b. Luz Southard

Luz Southard is the mother of Airman Valencia. At the time of the Khobar Towers bombing, Ms. Southard continuously watched news reports of the attack, and repeatedly called Eglin Air Force Base for information on her son's condition. Valencia Rpt. at 12. During this

period, Ms. Southard was "frantic," and she became convinced that her son had died in the attack. *Id.* Many hours after hearing about the bombing, Ms. Southard learned that her son was alive, but suffering from "a tremendous injury," *id.*; it was several more days, however, before he would return to the United States so that Ms. Southard could be with him at the hospital. *Id.* at 12–13. She has since had to endure watching her son go through over twenty surgeries to aid his recovery, and ever since the attack has noticed a number of changes in his attitude and condition, which in turn cause her significant stress and pain. *Id.* at 13. The framework for intentional infliction of emotional distress awards, set forth above, begins with a baseline award of $2.5 million for parents of persons injured in terrorist attacks. Based on the evidence above, the Court agrees with the special master that while Ms. Southard, like many, has suffered through an unimaginable ordeal, there is no basis to warrant a deviation from this standard award given the evidence in this case.

### c. Steven Wolfe

Steven Wolfe was offsite at the time that Building 131 of the Khobar Towers complex was bombed, and thus suffered no physical injury in the attack. Wolfe Rpt. at 8. However, substantial evidence presented to the special master establishes that the attack caused Airman Wolfe to suffer severe psychological trauma. For example, he testified to the special master that his initial reaction upon learning of the attack was to be "completely full of hatred." *Id.* Airman Wolfe goes on to describe sinking into a deep depression, abusing alcohol, and being unable to connect with his new daughter. *Id.* at 9. Airman Wolfe was eventually diagnosed with PTSD. *Id.* at 10–12. As a result of his psychological condition, Airman Wolfe frequently suffers flashbacks to the event, *id.* at 10–11, has attempted suicide on at least two occasions, *id.* at 11, and has been repeatedly hospitalized. *Id.* at 12.

The lack of physical injury suffered by a victim of state-sponsored terrorism generally counsels in favor of departing downward from the baseline award for pain and suffering. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 84 (departing downward where victim was knocked to ground but was not "seriously physically injured"); *Peterson*, 515 F. Supp. 2d at 54 (departing downward where victim "was minimally injured" but "suffered lasting and severe psychological problems"). Though Airman Wolfe has suffered significant psychological effects resulting from PTSD, these setbacks cannot—standing alone—warrant a baseline damage award. However, in light of the severity and debilitating effects of Airman Wolfe's disorder, the Court concurs with the special master that any departure should not be too severe, and awards $3 million.

### d.    Sonya Turner Broadway

Sonya Turner Broadway was off-duty and in her room in Building 131 when the bomb detonated outside the building. Broadway Rpt. at 7–8. Airman Broadway recalls being "sucked toward" the explosion when it occurred, and was flung from the hallway just outside her room into the kitchen. *Id.* at 8. She was evacuated shortly thereafter, during which she was forced to walk across broken glass while barefoot. *Id.* After escaping Building 131, Airman Broadway noticed that she was having difficulty standing and, upon examining her foot, noticed that it was turning blue and that the bones in the foot were visibly strained. *Id.* at 8–9. Eventually, she was carried by another airman to the medical clinic, where sat and waited for a few hours. *Id.* at 9. After deciding that she was not too terribly injured, Airman Broadway began manning the phones at the clinic. *Id.* Eventually, a medic noticed the condition of her foot, and put ice on it; and the next day a doctor informed her that the foot was broken, and placed a cast on it. *Id.* at 9–10. While the pain in her foot eventually subsided, Airman Broadway began suffering the symptoms of PTSD shortly after the attack and was forced to leave the military less than a year

later due to the effects of her condition. *Id.* at 10–11. Today, the effects of her psychological disorder have grown stronger, and Airman Broadway is currently unemployed because she "couldn't work anymore around people." *Id.* at 12. As with Airman Valencia, Airman Broadway's combined physical and psychological injuries warrant receipt of the baseline damage amount of $5 million for pain and suffering.

## 2. Punitive Damages

In assessing punitive damages in cases arising out of events in which such damages have previously been assessed, this Court has observed that any award must balance the concern that "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little deterrent effect . . . creating anomalous results," *Murphy*, 740 F. Supp. 2d at 75, against the need to continue to deter "the brutal actions of defendants in planning, supporting and aiding the execution of" terrorist attacks. *Rimkus II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *55. To accomplish this goal, this Court—relying on the Supreme Court's opinion in *Philip Morris USA v. Williams*, 549 U.S. 346 (2007)—held that the calculation of punitive damages in subsequent related actions should be directly tied to the ratio of punitive to compensatory damages set forth in earlier cases. *Murphy*, 740 F. Supp. 2d at 76. Thus, in *Murphy* this Court applied the ratio of $3.44 established in *Valore*—an earlier FSIA case arising out of the Beirut bombing, *id.* 77; and in *Rimkus II* this Court applied the ratio of $1.03 that was established by the *Heiser II* opinion in litigation related to the Khobar Towers bombing. ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120991 at *57. Here, the Court will again apply this same $1.03 ratio, which has been established as the standard ratio applicable to cases arising out of the Khobar Towers bombing. Application of this ratio results in a total punitive award of $ 15,965,000.

**V.      CONCLUSION**

For the reasons set forth above, the Court finds that defendants Iran, MOIS and the IRGC are responsible for plaintiffs' injuries and thus liable under the FSIA's state-sponsored terrorism exception for $31,465,000 in compensatory and punitive damages.  In closing, the Court applauds plaintiffs' persistent efforts to hold Iran accountable for its heinous and malicious acts, and expresses hope that the conclusion of this litigation may bring some measure of comfort to plaintiffs.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 31, 2010.